CITIZENS ACTION COALITION OF INDIANA, INC., Appellant,

v.

NORTHERN INDIANA PUBLIC SERVICE COMPANY, et al., Appellees–Petitioner, and Statutory Party.

No. 93A02–0212–EX–1062.

Court of Appeals of Indiana.

March 9, 2004.

Michael A. Mullett, Jerome E. Polk, Mullett Polk & Associates, LLC, Indianapolis, IN, Attorneys for Appellant.

Fred E. Schlegel, Peter L. Hatton, Gabriel Bender, Baker & Daniels, Daniel W. McGill, Stanley C. Fickle, Barnes & Thornburg, Indianapolis, IN, Attorneys for Appellees Northern Indiana Public Service Company.

## OPINION

BARNES, Judge.

### Case Summary

The Citizens Action Coalition of Indiana ("CAC") appeals the final order ("42150 Order") of the Indiana Utility Regulatory Commission ("Commission") relating to the rates and charges of Northern Indiana Public Service Company ("NIPSCO"). We affirm.

### Issues

We address three issues in this appeal, namely:

I. whether the issues raised by CAC on appeal are waived because they were not raised before the Commission;

II. whether the 42150 Order violates the Indiana Administrative Code by permitting the exclusion of the return allowed pursuant to statute on NIPSCO's investment in certain clean coal technology ("CCT") from NIPSCO's Fuel Adjustment Charge ("FAC") earnings cap calculation; and

III. whether the 42150 Order violates the Indiana Administrative Code by providing an allocation among customer classes of the costs of NIPSCO's qualified pollution control property ("QPCP") based on the allocation methodology in the most recent cost study rather than in the latest base rates case.

## Facts

On January 4, 2002, NIPSCO requested that the Commission issue the required certificate for Selective Catalytic Reduction ("SCR"), Over Fire Air, and Low NOx (nitrous oxide) Burner projects at several of its generating plants. It petitioned the Commission for the issuance of the certificate pursuant to Indiana Code Chapter 8–1–8.7 [1] for approval of certain CCT, approval of the use of the designated CCT as QPCP under Indiana Code Section 8–1–2–6.6, and approval of specified ratemaking treatment of the capital costs and operation and maintenance ("O&M") and depreciation expenses connected with the QPCP. NIPSCO proposed the use of the designated CCT to meet the requirements of the Indiana State Implementation Plan ("SIP") developed in response to federal rules regulating NOx emissions and the related Indiana NOx SIP Call promulgated by the Environmental Protection Agency ("EPA"). Generally, these rules require NIPSCO to reduce NOx emissions at its electric generating stations to a level of 0.15 lbs/mmBtu by May 31, 2004.

In February 2002, the United Steelworkers of America, Local 12775 ("Steelworkers") petitioned to intervene, as did LaPorte County and the City of Michigan City (collectively "Intervenors"). The Commission granted the petitions. Pursuant to statute, the Office of Utility Consumer Counselor ("OUCC") also participated as a party.

On June 20, 2002, NIPSCO and the OUCC filed a Stipulation and Settlement Agreement ("42150 Settlement") resolving all matters at issue in NIPSCO's petition. The Intervenors were not a party to the 42150 Settlement. The 42150 Settlement called for Commission certification of the CCT.

On August 12, 2002, NIPSCO moved to amend its petition to reference Indiana Code Section 8–1–2–6.8, which went into effect after the filing of NIPSCO's original petition, as another statute applicable to the proceeding. Because none of the parties opposed the amendment, the 42150 Settlement as filed took into consideration the new statute.

The next day, the Commission conducted an evidentiary hearing on NIPSCO's amended petition and the 42150 Settlement. Although the need for and nature of NIPSCO's QPCP was not at issue, the precise ratemaking treatment to be afforded NIPSCO's QPCP was an issue in the proceedings before the Commission. Thereafter, the parties filed their proposed orders. On November 26, 2002, the Commission entered its 42150 Order approving the 42150 Settlement.

In the 42150 Order, the Commission found that the proposed SCR, Over Fire Air and Low NOx Burner projects pro-

---

1. CCT is defined in Indiana Code Section 8–1–8.7–1 as technology that reduces airborne emissions of sulfur- or nitrogen-based pollutants associated with the combustion of coal that either: (a) was not in general use at the same or greater scale in new or existing facilities in the United States as of January 1, 1989; or (b) has been selected for funding by the U.S. Department of Energy under its CCT program and was finally approved for such funding on or after January 1, 1989. Indiana Code Section 8–1–8.7–3 requires that before a utility may use CCT at its generating facilities, it must obtain from the Commission a certificate stating that the public convenience and necessity will be served by such use. Indiana Code Section 8–1–8.7–4 further requires that to issue the certificate, the Commission must approve the utility's estimated cost of constructing the CCT. Indiana Code Section 8–1–8.7–7 provides that an applicant for a CCT certificate may elect to undergo ongoing review of its construction and construction costs, in which case the utility must periodically submit progress reports and cost estimate revisions to the Commission.

posed by NIPSCO constitute clean coal technology projects as defined in Indiana Code Section 8–1–8.7–1 and that those projects would serve public convenience and necessity. The Commission also approved the proposed rate treatment and costs contained therein. In the 42150 Settlement that was approved by the Commission, the parties had agreed that NIPSCO would file annually for Commission approval of its ongoing, five-year plan for environmental compliance, including details of NIPSCO's projected capital expenditures for the upcoming twelve-month period and actual expenditures for the most recent twelve-month period. The parties further agreed that NIPSCO would file semi-annually for Commission approval of a billing surcharge to reflect a return on environmental capital expenditures made. These surcharges are subject to refund until the Commission has completed its annual investigation of the costs and has approved them. Recovery of operating and depreciation expenses are to begin only after the related facilities commence operation and the Commission has found such expenses reasonably incurred. NIPSCO also agreed to file on an annual basis its request for recovery of actual CCT O&M and depreciation expenses incurred during the previous twelve months. Depreciation expenses will be predicated upon NIPSCO's current depreciation rates.

The 42150 Settlement also provided:

Allocation of demand related costs shall be based on the allocation methodology in the cost study shown in Respondent's Revised Exhibit RDG–2 and related work papers in IURC Cause No. 41746, reproduced as Petitioner's Exhibit RDG–2 in this Cause No. 42150. The

parties agree that NIPSCO's return on its investment in CCT should be excluded from NIPSCO's FAC earnings cap calculation and that exclusion is a part of this Settlement Agreement....

Appellant's App. p. 21. To implement the ratemaking treatment called for in the 42150 Settlement, the Commission also approved two rate surcharge mechanisms denominated by NIPSCO as the "Environmental Cost Recovery Mechanism" ("ECRM") and the "Environmental Expense Recovery Mechanism" ("EERM") (collectively "environmental surcharges"). The environmental surcharges will increase customer rates by reference to certain formulae. The environmental surcharges allow NIPSCO in future proceedings to recover through its rates approved environmental costs, including a return on CCT costs in accordance with Indiana Code Sections 8–1–2–6.6 and 8–1–2–6.8, and its incremental operation, maintenance, and depreciation expense after commencement of commercial operation of the CCT.

In December 2002, CAC filed its Notice of Appeal with the Commission. Simultaneously, CAC filed with this court a verified petition to appeal final order of the Commission, a case summary, and a motion to consolidate this appeal with the already pending appeal in Cause No. 93A02–0210–EX–855, which related to the Commission's September 23, 2002 Final Order in Cause No. 41746 concluding an investigation into NIPSCO's base rates and charges.[2] In January 2003, we denied CAC's motion to consolidate but granted the verified petition to appeal. In April 2003, this court conducted a pre-appeal conference, the principal topic of which

---

**2.** On October 14, 2003, a panel of this court issued an opinion in that case affirming a settlement negotiated by NIPSCO, NIPSCO Industrial Group, and the OUCC. *Citizens*

*Action Coalition of Indiana, Inc. v. Northern Indiana Public Service Co.,* 796 N.E.2d 1264 (Ind.Ct.App.2003), *trans. pending.*

was CAC's request that this appeal be held in abeyance pending final resolution of the appeal in the base rates appeal. We denied the request and now render a decision in this matter.

## Analysis

■ As a threshold matter, we note our standard of review for appeals from administrative decisions. Our review of an administrative decision is limited to whether the agency based its decision on substantial evidence, whether the agency's decision was arbitrary and capricious, and whether it was contrary to any constitutional, statutory, or legal principle. *PSI Energy, Inc. v. Indiana Office of Utility Consumer Counsel*, 764 N.E.2d 769, 774 (Ind.Ct.App.2002), *trans. denied.* We are not allowed to conduct a trial de novo, but rather, we defer to an agency's fact-finding, so long as its findings are supported by substantial evidence. *Id.*

■ The first stage of our review examines whether the agency's "decision contain[s] specific findings on all of the factual determinations material to its ultimate conclusions," which is especially important when the agency's decision is a rate order. *Id.* Basic findings of fact are important because they enlighten us as to the agency's "reasoning process and subtle policy judgments" and allow for "a rational and informed basis for review," which lessens the likelihood that we would substitute our "judgment on complex evidentiary issues and policy determinations" better decided by an agency with technical expertise. *Id.* Requiring an agency to set forth basic findings also assists the agency "in avoiding arbitrary or ill-considered action." *Id.*

■ The second stage of the review process examines whether there is substantial evidence in the record to support the agency's basic findings of fact. *Id.* To determine whether there was substantial evidence sufficient to support the agency's determination, we must consider all evidence, including that evidence supporting the determination as well as evidence in opposition to it. *Id.* We may set aside agency findings of fact only when we determine, after a review of the entire record, that the agency's decision clearly "lacks a reasonably sound basis of evidentiary support." *Id.*

■ Additionally, however, it is well established that the substantial evidence test cannot be utilized to analyze the reasonableness of the conclusions of ultimate fact inferred by an agency from its findings of basic fact. *Id.* Therefore, even though an agency's findings of fact may represent inferences drawn by the agency and thus not be susceptible to scrutiny for evidentiary support, the reasonableness of the agency's inferences is an appropriate judicial determination. *Id.* Moreover, any agency determination that is not in accordance with the law may be set aside because we owe no deference to an agency's conclusions of law. *Id.*

### I. Waiver

The first issue we address is that of waiver. NIPSCO contends that the issues and grounds for appeal asserted by CAC were neither raised nor preserved before the Commission and are, therefore, waived for purposes of appeal. The statute pursuant to which CAC filed its appeal provides:

Any person, firm, association, corporation, limited liability company, city, town, or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in

this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases. An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

Ind.Code § 8–1–3–1. CAC maintains that because it had the statutory authority to appeal pursuant to this section, it was permitted to raise issues not raised below because it was not a party to those proceedings.

■ Our supreme court addressed the question as to which issues CAC may raise when bringing an appeal pursuant to Indiana Code Section 8–1–3–1 in *Citizens Action Coalition of Indiana, Inc. v. Public Serv. Co. of Ind., Inc.,* 582 N.E.2d 330 (Ind.1991). In that case, our supreme court addressed the issue that is before us today, namely whether CAC, in pursuing an appeal from an order of the Commission, can raise issues not presented to the Commission below. *Id.* In holding that CAC was not precluded from raising new issues, our supreme court reasoned:

> [N]otwithstanding the contention of PSI to the contrary, this interpretation of I.C. 8–1–3–1 effectively requires potential appellants to intervene in the Commission proceeding in order to preserve for appeal specific arguments which may be made that the Commission's decision was in error. PSI maintains that adversely affected ratepayers who fail or choose not to intervene in proceedings before the Commission may bring an appeal from a rate order under the statute, but that in that appeal the ratepayer may challenge the order only on grounds advanced by one of the parties or intervenors which appeared before the Commission. The situation at hand illustrates the miscreant nature of this position. Only one argument was advanced in the proceeding below, and that argument was to make no adjustment to PSI's retail rates despite a 12% drop in one category of that utility's operating expenses. According to PSI, adversely affected ratepayers indeed had the right to appeal the Commission's order as erroneous but, unfortunately, no arguments upon which to base their appeal remained viable because all parties and intervenors were in agreement that this was the appropriate treatment of PSI in the wake of the Tax Reform Act. In order to assure the proper preservation of arguments to be made on appeal under PSI's interpretation of the statute, CAC, or any other party who might later consider itself to be "adversely affected" by the Commission's decision and wish to avail itself of the opportunity for judicial review afforded by I.C. 8–1–3–1, would have to intervene in the proceeding and make sure those particular arguments were made even though such participation is not a prerequisite to appeal under the terms of the statute. *PSI's interpretation of I.C. 8–1–3–1 makes a sham of the right to challenge a Commission decision subsequent to the proceeding that the legislature has afforded to all ratepayers, whether participants in the Commission proceeding or not, and it effectively forecloses judicial review of a Commission decision if those appearing before the Commission enter into what amounts to a consent decree. This is clearly an intolerable result.*

*Id.* at 334 (emphasis supplied).

CAC's ability to raise issues not raised below was clearly established by that case.

NIPSCO acknowledges this holding, but argues that the holding is impacted by the subsequent adoption of Indiana Appellate Rule 5(C)(2),[3] which deals with appeals from agency decisions. This rule provides:

1. *Jurisdiction.* The Court of Appeals shall have jurisdiction to entertain actions in aid of its jurisdiction and to review final orders, rulings, decisions and certified questions of an Administrative Agency.

2. *Assignment of Errors.* No party shall file an assignment of errors in the Court of Appeals notwithstanding any law, statute, or rule to the contrary. All issues and grounds for appeal *appropriately preserved before an Administrative Agency may be initially addressed in the appellate brief.*

App. R. 5(C)(2) (emphasis supplied). The term "Administrative Agency" includes the Commission. *See* App. R. 2(A).

NIPSCO argues that the new appellate rule specifically limits issues and grounds on appeal to those "appropriately preserved" before the Commission and thus, the rule overrides Indiana Code Section 8–1–3–1 to the extent the statute allows strangers to a Commission proceeding to raise new issues on appeal. In short, NIPSCO argues that because the grounds for appeal set forth in CAC's brief were not raised before the Commission, they necessarily have not been "appropriately preserved before [the] Administrative Agency" as required by the rule. Appellee's Br. p. 9.

By concentrating on the last sentence of the rule, NIPSCO takes it out of context. To properly understand the purpose of the rule, it is necessary to consider the rule in its entirety. The first portion of the rule defines the jurisdiction of the Court of Appeals in appeals from administrative agencies. The second portion of the rule addresses the "Assignment of Errors." That portion specifically prohibits the filing of an assignment of errors, thereby abandoning the former requirement that an assignment of errors be filed in appeals from decisions by administrative bodies such as the Unemployment Board and the Commission. *See Scott Paper Co. v. Public Serv. Comm'n,* 164 Ind.App. 565, 567, 330 N.E.2d 137, 139 (1975) (holding that the assignment of errors in such a statutory appeal was the initial pleading in the reviewing court and served the same function as the complaint in special statutory proceedings in a trial court; without the filing of an assignment of errors, the jurisdiction of this Court was not initiated, and the power of review could not be pursued).

Rather than setting forth the grounds for appeal in a separate assignment of errors, parties are now permitted to raise all "appropriately preserved" issues for the first time in the appellate brief. Thus, those litigants who were parties to the proceedings before an administrative agency are now able to list the grounds of appeal in their appellate briefs rather than an assignment of error, but those grounds would be limited to those properly preserved below. *See National Rural Util. Co-op. Finance Corp. v. Public Serv. Comm'n,* 552 N.E.2d 23, 29 (Ind.1990) (holding that an appellate court will not review issues on appeal that were never before and, therefore, never ruled upon, by an administrative body). In other words, "appropriately preserved" for those litigants would mean sufficiently preserved below.

**3.** The rule limiting administrative agency appeals to grounds appropriately preserved for appeal before the agency was originally adopted in 1995 as Appellate Rule 4(C) and became Appellate Rule 5(C)(2) with the 2001 revisions.

However, "appropriately preserved" does not hold the same meaning when applied to those litigants who are appealing an administrative decision via Indiana Code Section 8–1–3–1 and were not parties below. Our supreme court has unequivocally held that those litigants are permitted to raise issues in their appeals that were not addressed below. Thus, for them, issues do not have to have been raised below to have been "appropriately preserved" for purposes of Appellate Rule 5.

We recognize that Indiana Code Section 34–8–1–3 provides that "[t]he supreme court has authority to adopt ... rules of court that govern and control practice and procedure in all the courts of Indiana," and "all laws in conflict with the supreme court's rules have no further force or effect." We see no indication in the Appellate Rule promulgated by our supreme court after its holding in *Citizens Action Coalition of Indiana, Inc. v. Public Serv. Co. of Ind., Inc.* that it intended to extinguish the ability to raise new issues by parties appealing pursuant to Indiana Code Section 8–1–3–1. Because that case was existing law at the time of the rule promulgation, we conclude the rule would have had to much more clearly indicate an intended change in the law. *Cf. South Eastern Indiana Natural Gas Co. v. Ingram*, 617 N.E.2d 943, 953 (Ind.Ct.App. 1993) (holding that the General Assembly has the power to abrogate or modify the common law, but when it fails to do so either in express terms or by unmistakable implication, we must presume that the legislature is aware of the common law and does not intend any change). We will not read an intent to extinguish the ability to raise new issues into the adoption of the

rule and will instead construe the rule and the supreme court precedent in harmony unless and until our supreme court gives clear guidance to the contrary. To hold otherwise would be to render the ability of litigants appealing pursuant to Indiana Code Section 8–1–3–1 essentially meaningless by binding them to the issues addressed below. Our supreme court has already rejected such an outcome. *See Dragon v. State*, 774 N.E.2d 103, 107 (Ind. Ct.App.2002) (holding that supreme court precedent is binding upon us until it is changed either by that court or by legislative enactment), *trans. denied*. The grounds for appeal raised by CAC are not waived.

## II. FAC Earnings Cap Calculations

The 42150 Settlement as approved by the Commission expressly provided that "NIPSCO's return on its investment in CCT should be excluded from NIPSCO's [Fuel Adjustment Charge] earnings cap calculation and that exclusion is part of this Settlement Agreement." Appellant's App. p. 21. CAC challenges the approval of this language and argues that the earnings were required to be added to NIPSCO's net operating income ("NOI").

Indiana Code Section 8–1–2–6.6(b) provides:

Upon the request of a utility that began construction after October 1, 1985, and before March 31, 2002 [4] of qualified pollution control property that is to be used and useful for the public convenience, the commission shall for ratemaking purposes add to the value of that utility's property the value of the qualified pollution control property under construction....

---

4. Indiana Code Section 8–1–2–6.8 applies to QPCP, the construction of which began after

March 31, 2002.

The Commission rule at 170 Indiana Administrative Code Section 4–6–21 follows, stating in relevant part:

> (a) A utility that receives ratemaking treatment under this rule (170 IAC 4–6) for the value of its qualified pollution control property under construction shall do the following:
>
> > (1) *Add the approved CWIP earnings to its net operating income* authorized by the commission for purposes of IC 8–1–2–42(d)(2) and IC 8–1–2–42(d)(3) in a fuel adjustment charge proceeding.

170 IAC 4–6–21(a)(1) (emphasis supplied).

Under Indiana Code Section 8–1–2–42(d), an electric generating utility may apply for a change in its fuel charge as often as once every three months. When a utility files such an application, it is required to show the Commission the change in the cost of fuel it uses to generate electricity and the cost of fuel included in the cost of electricity it purchases from other suppliers over the period between its last order from the Commission approving fuel costs in its basic rates and the latest month for which actual fuel costs are available. The resulting charge is commonly known as a FAC. An important component of the FAC procedure is the "earnings test," which requires the reduction of a proposed FAC to the extent it would result in cumulative excess or "over" earnings by a utility above its authorized NOI. *See* I.C. §§ 8–1–2–42(d)(3) and 42.3.

The first step in the "earnings test" is a determination of whether the utility's actual NOI for the prior twelve months exceeded the authorized NOI in the utility's last base rates case. Indiana Code Section 8–1–2–42(d) states in pertinent part:

> [T]he commission ... shall grant the electric utility the requested fuel cost charge if it finds ... (3) the fuel adjustment charge applied for will not result in the electric utility earning a return in excess of the return authorized by the commission in the last proceeding in which the basic rates and charges of the electric utility were approved. However, subject to section 42.3 of this chapter, if the fuel charge applied for will result in the electric utility earning a return in excess of the return authorized by the commission, in the last proceeding in which basic rates and charges of the electric utility were approved, the fuel charge applied for will be reduced to the point where no such excess of return will be earned....

CAC contends that a conflict exists between the 42150 Settlement provision permitting NIPSCO's return on its QPCP investment to be excluded from its FAC earnings cap calculation and 170 IAC 4–6–21(1) directing that approved CWIP earnings be added to NOI for purposes of a FAC proceeding. CAC argues that the conflict between the 42150 Settlement provision and the rule has "significance with respect to the treatment of excess or 'over' earnings under both the statutory earnings test found in Ind.Code § 8–1–2–42(d)(3) and a provision of the Commission's final order of September 23, 2002 in Cause No. 41746."[5] Appellant's Br. p. 11. CAC con-

---

**5.** In its final order in Cause No. 41746, the Commission recognized that its approval of the 41746 Settlement could well result in earnings by NIPSCO during the next four years over the $225 million level of NOI that the 41746 Settlement authorized, let alone the lower earnings levels recommended by the Commission's Staff and the non-settling par-

ties, including CAC. The Commission ordered:

> The Settlement Agreement specifies that the authorized return is to remain the same and the earnings bank to continue. However, the Settlement does not specifically address how the over-earnings should be handled. While we agree that the Credits

tends that under the 42150 Settlement, the amount of earnings on QPCP that would avoid consideration in the statutory earnings test and the 41746 Order sharing mechanism would be substantial, eventually surpassing $18 million per year.[6]

 NIPSCO asserts that excluding the QPCP-related return from the actual return realized for purposes of the FAC earning test, as provided for in the 42150 Settlement, is the economic equivalent of increasing the overall allowed return by the amount of authorized return on QPCP. In support of its petition, NIPSCO presented the testimony of David Vajda, the Vice President of Finance and Administration for the Merchant Business Unit of NiSource, which includes the electric generation and transmission business of NIPSCO. Vajda testified that there was no intent to do anything different than what is required in the regulation. When asked how NIPSCO will treat the earnings associated with CWIP Ratemaking Treatment, Vajda replied:

> In accord with 170 IAC 4–6–21, NIPSCO will add all CWIP earnings to its authorized NOI for purposes of the FAC (d)(2) and (d)(3) tests. For example,

> provide immediate benefits to NIPSCO's customers, in order to clarify what NIPSCO is allowed to earn we find it in the public interest to address how the over-earnings will be handled on a going-forward basis. The Commission, charged with balancing the interests of consumers and the interests of the affected utility, finds it appropriate to include a sharing mechanism between the utility and ratepayers. The sharing mechanism provides for a sharing of the over-earnings reported by NIPSCO in each FAC on a yearly basis. The earnings will be calculated as is done currently in each FAC. If the earnings calculation demonstrates an over-earning for the most recent twelve-month period, that amount will be divided by four for each three-month period of an FAC. The over-earnings amount is then shared and forty percent will inure to the

NIPSCO's current approved electric utility NOI is $225 million. Assuming $1.0 million in CWIP earnings, the Company will utilize a $226 million NOI for purposes of the earnings test under IC 8–1–2–42(d)(2).

*Appellee's App. pp. 9–10.* As to whether there was a difference between that explanation and the Settlement provision, Vajda answered no and explained:

> [By] adding the earnings to the authorized net operating income for purposes of the fuel adjustment clause, you're in effect excluding the effect of those incremental earnings.

> So I think we're saying the same thing. I think—I mean the source of confusion is, are we looking at adding to NOI—if you add to the NOI, you in effect exclude those earnings from the FAC test.

> If you don't change the NOI for those tests, what would happen is they would come through your actual charges and there would be an impact on the FAC. So by doing it the way I'm proposing in my answer to Question 24, we are in effect excluding it from the earnings test calculation.

> benefit of the ratepayers and be passed back to the ratepayers through each FAC filing in the form of bill reduction. The remaining portion will be retained by NIPSCO and allowed to continue to offset the cumulative under-earnings since the last rate order as currently calculated in each FAC. This mechanism balances the interests of the ratepayers as well as the utility.

*Citizens Action Coalition v. Northern Ind. Pub. Serv. Co.,* No. 41746, slip op. at 19 (Ind.Util. Reg.Comm'n, Sept. 23, 2002).

6. CAC arrives at this number by multiplying $235 million (the amount NIPSCO estimated that its QPCP would increase the value of its rate base over time) by 7.70% (NIPSCO's projection of an authorized rate of return on this increment to its rate base).

Appellee's App. p. 119. He further addressed the policy that electric utility companies should be able to recover a return on substantial investments required for environmental compliance without risking the loss of those returns, stating:

> From a logical perspective, the legislature found it important enough to make these expenditures and provided that opportunity.
>
> It wouldn't make sense for the utility to make the expenditures, be allowed the additional return, and then through the return mechanism, have to immediately refund those incremental revenues that the statute granted for those [CCT] investments.
>
> In essence, it would be granting the recovery and the return on the investment with one hand and taking it back through the other hand.

Appellee's App. p. 120.

Cathy Hodges is the Director, Rates and Structure, for Energy Supply Services of the Merchant Business Unit of NiSource, which includes the electric generation and transmission business of NIPSCO. She explained:

> NIPSCO proposes a semi-annual letter filing process for the ECRM billing factors, with an annual hearing. As proposed, the Commission will conduct annually an evidentiary hearing to approve NIPSCO's ongoing five-year compliance plan and its estimated environmental expenditures. The annual hearing will also serve to reconcile actual sales with estimated sales and resolve any issues involving the actual expenditures for the prior twelve-month period and remove all refund obligations related to such expenditures. The ECRM collection will be based upon actual environmental compliance expenditures. I.e., NIPSCO will not use estimated CCT costs for purposes of determining the ECRM billing factors.
>
> As proposed, new ECRM factors shall be filed with the Commission semi-annually and be based on CCT costs incurred since the prior semi-annual revenue requirement, and the forecasted six-month kWh sales. The ECRM will require NIPSCO to file with the Commission five business days prior to the beginning of each recovery period the proposed tariff sheets containing the billing factors, together with supporting documentation and a revised Appendix C in the Company's tariff to become effective without an additional hearing.

Appellee's App. pp. 78–79. In her Supplemental Direct Testimony, she confirmed that the proposed cost recovery mechanisms permit the recovery of only actual costs of environmental law compliance.

NIPSCO responds that CAC's "argument that under the Commission's Order, NIPSCO could over-earn on its QPCP investment (because the return authorized is excluded from the FAC earnings test fails), is simply wrong." Appellee's Br. p. 16. It states that CAC's examples of possible over-earning situations "wholly ignore" the ECRM true-up mechanism. Appellee's Br. p. 16. NIPSCO posits that because the overall return of 7.7% will be applied to actual expenditures, the only way NIPSCO could "overearn" on its CCT investment would be if it sold more mWh of electricity than projected in its semi-annual filings. However, NIPSCO contends that if more mWh than projected are sold, the ECRM's true-up mechanism calls for actual earnings to be compared with projected earnings, with any excess of revenues realized over revenues projected to be flowed back to NIPSCO's ratepayers in a future ECRM proceeding.

CAC's primary concern appears to be that the "intent and effect" of the Settle-

ment is to preclude the Commission from considering any over-earnings caused by NIPSCO's receiving the CCT return. However, we are satisfied with NIPSCO's response that adding the QPCP return to the authorized NOI has the same result as excluding it from realized earnings for purposes of the excess earnings test, and the "true-up" provision of the mechanism approved assures that there will be no "overearnings." There was evidence presented that NIPSCO's exclusion of its return on its investment in QPCP from its FAC earnings cap calculations is the financial equivalent of adding the earnings to the NOI. Evidence was also presented to establish that the true up provision would prevent any excess earnings.[7] Thus, the evidence supports the conclusion that the end result is the same from a financial perspective.

Our supreme court has repeatedly said that "when the meaning of an administrative regulation is in question, the interpretation of the administrative agency is given great weight unless the agency's interpretation would be inconsistent with the regulation itself." *State Bd. of Registration for Prof. Engineers v. Eberenz*, 723 N.E.2d 422, 427–28 (Ind.2000). The evidence supports the conclusion that the spirit and goal of 170 Indiana Administrative Code 4–6–21 have been satisfied here. We cannot conclude that it was erroneous for the Commission to allow NIPSCO's approach, effectively finding that it sufficiently complied with the rule. We have indicated our preference to place substance over form. *See MDM Invs. v. City of Carmel*, 740 N.E.2d 929, 933 (Ind.Ct.App.2000). Our role is simply to determine whether the Commission's decision clearly "lacks a reasonably sound basis of evidentiary support," not whether the accounting principles espoused by the experts are accurate. *See PSI Energy*, 764 N.E.2d at 774. Because there is evidentiary support for the Commission's decision on this point, we find no error.

### III. Cost of Service Study

The final issue to be addressed is CAC's contention that the Commission violated it own regulations by approving the 42150 Settlement directing that allocation of NIPSCO's QPCP costs among customer classes should be based on the allocation methodology in the cost study presented in Cause No. 41746.[8] The allocation of QPCP

---

7. CAC challenges the true up provision in its Reply Brief by arguing that it is not adequate because it does not reconcile projected and actual earnings but rather reconciles projected and actual revenues. CAC also claims that the true up mechanism does not track whether there is any difference between projected and actual expenses associated with QPCP investments. To the extent CAC challenges the adequacy and substance of the true up mechanism, it does so for the first time in its Reply Brief, and, therefore, waives the issue. *See* Ind. Appellate Rule 46(C) ("No new issues shall be raised in the reply brief."); *Wheatley v. American United Life Ins. Co.*, 792 N.E.2d 927, 933 (Ind.Ct.App.2003), *trans. denied.* The ECRM true up mechanism is designed to monitor and reconcile NIPSCO's expenditures and earnings with respect to environmental compliance endeavors. Had CAC intended to challenge the adequacy of that mechanism, it should have done so in a separate issue in its Appellant's Brief, including citations to authority and evidence to support its argument, in addition to or instead of challenging the manner in which the 42150 Settlement addressed FAC calculations.

8. That study, which was prepared by Robert Greneman, was based on the audited financial results of NIPSCO's electric operations for the 12 months ending December 31, 1999, adjusted for changes that were known, fixed, and measurable thereafter and within the 12 months ending December 31, 2000. The class demands used in that cost study were based on control area peaks and NIPSCO load research data for calendar year 2000, which was used because of abnormal weather conditions in 1999 and more normal weather conditions in 2000.

costs among a utility's customer classes is controlled by the Commission rule codified at 170 IAC 4–6–15. This rule provides:

A utility's jurisdictional revenue requirement that results from the ratemaking treatment of qualified pollution control property under construction under this rule (170 IAC 4–6) shall be allocated among the utility's customer classes in accordance with the allocation parameters established by the commission in the utility's last general rate case.

170 IAC 4–6–15.

CAC argues that for the 42150 Settlement to comply with this rule regarding QPCP cost allocation, it would necessarily follow that the Commission would have considered Cause No. 41746 to be NIPSCO's "last general rate case" for purposes of Cause No. 42150. CAC asserts that for purposes of all the other ratemaking parameters it set in Cause No. 42150 except for QPCP cost allocation among customer classes, the Commission considered NIPSCO's "last general rate case" to be Cause No. 38045 ("1987 study"), not Cause No. 41746.[9]

■ In support of its argument that the revenue requirement allocation called for by the 42150 Settlement is inconsistent, CAC claims that the "results of this inconsistency in revenue requirement allocation were well understood by the parties and the Commission." Appellant's Br. p. 17. CAC argues:

The NIPSCO cost of service study submitted in Cause No. 38045 and followed in allocating the customer credits in Cause No. 41746 recommended an "across-the-board" allocation of any change approved in the utility's revenue requirement, i.e. the same percentage increase or decrease in rates for each customer class, whether residential, commercial or industrial. As the Commission expressly found in the 41746 Order:

In our view, the proposed $225 million of Guaranteed Credits should be allocated "across the board" to eligible customers. No party in this case argued for anything other than an "across the board" application of any change in rates. The Greneman study confirms that an "across the board" application of any rate change is appropriate. Indeed, the Greneman study confirms the appropriateness of continuing the rate design underlying the rates and charges approved in the 1987 Order. [T]he Greneman cost of service study is being used here, as well as in Cause No. 42150.

However, using only the demand-related allocators in the cost study submitted in Cause No. 41746 to determine the proportion of increased QPCP costs to be borne by each customer class, the 42150 Settlement and Order definitely did *not* allocate NIPSCO's increased revenue requirement for QPCP costs "across the board." Instead, the ratemaking treatment contemplated by the 42150 Settlement and Order assured that NIPSCO's residential customers would pay significantly larger Environmental Surcharges than other customer classes, especially NIPSCO's industrial customers, would pay significantly smaller Environmental Surcharges than an "across-the-board" allocation would entail.

9. It points to examples where the Commission stated in the 42150 Order, "The cost rate for common equity and customer deposits will be those approved in the Company's last electric rate case, Cause No. 38045" and "NIPSCO will now depreciate the QPCP projects using the same depreciation rates ordered by the Commission in Cause No. 38045." Appellee's App. pp. 13–14.

Appellant's Br. pp. 17–18 (emphasis original) (internal citations omitted).[10]

NIPSCO argues that the purpose of the rule requiring that allocation among customer classes be governed by the utility's last general rate case is to allow utilities to avoid the necessity of preparing a costly cost of service study every time they seek authorization for QPCP investments. It argues that the rule is not intended to preclude use of newer and more accurate studies in situations where they have already been prepared for other reasons.

> Over the years since NIPSCO's last general rate case in 1987, approximately twelve new rate schedules and corresponding customer classes have been created. Therefore, Rule 15–which provides for QPCP costs to "be allocated *among the utility's customer classes* in accordance with the allocation parameters established by the Commission in the utility's last general rate case" (emphasis added)—is literally impossible to apply in this case. The "allocation parameters" in NIPSCO's 1987 general rate case cannot be used to allocate the costs "among [NIPSCO's] customer classes," because the 1987 Study did not

have allocation parameters addressed to customer classes that then did not exist. Appellee's Br. p. 19 (internal citation omitted).[11]

Robert Greneman is an Associate Director in the Markets, Finance and Regulation group with the firm of Stone & Webster Consultants, Inc. He produced the study ("Greneman study") relied upon in the 42150 Settlement that was approved by the Commission. NIPSCO points to his testimony during the proceedings below that the use of the 1987 cost of service study would be "totally inappropriate." Appellee's App. p. 114. Greneman explained that the QPCP rates will be developed by dividing the costs allocated to each customer class by forecasted kilowatt hour sales to each class. Greneman posited that because the 1987 study allocated costs based on the demands of each class in 1987, use of that study with current forecasted sales would erratically and inappropriately result in very high and very low rates for classes that have experienced substantial change since 1987.[12]

NIPSCO witness Hodges confirmed that NIPSCO's customer classes and the numbers of customers taking service within

10. CAC maintains that NIPSCO projected the initial Environmental Cost Surcharge for Rate 811 (the basic residential rate) would be $0.000099 per kwh, or 2.68 times the $0.000037 per kwh for Rate 833 (the large industrial rate.). Similarly, CAC maintains that the initial Environmental Expense Surcharge for Rate 811 would be $0.000944 per kwh, or 2.31 times the $0.000409 per kwh for Rate 833.

11. In its Reply Brief, CAC makes much ado about NIPSCO's use of the term "literally impossible," arguing that "the Commission's order includes no finding and cites no evidence that compliance with its rule was 'literally impossible.'" Reply Br. p. 8. This argument somewhat misconstrues NIPSCO's point, which we read to mean that as a practical matter it would be impossible to accu-

rately allocate costs among the customer classes as required by 170 IAC 4–6–15 by using the 1987 study because there are numerous classes that exist now that did not in 1987. We do not understand NIPSCO's argument to be that it was asserting an actual impossibility defense to its alleged failure to comply with the regulation.

12. Other than advocating an across-the-board allocation technique, CAC does not explain what it would consider a proper allocation to be. Furthermore, it does not address the concern that using the outdated data from the 1987 study would produce an inequitable distribution among classes whereby the distribution would only be among those classes in existence in 1987 and not at all among those classes established since that time.

those classes had substantially changed since 1987. She stated:

> 170 IAC 4–6–15 specifies that the utility's jurisdictional revenue requirement related to QPCP is to be allocated among the utility's customer classes in accordance with the allocation parameters used in its last general rate case. NIPSCO's last general rate case was in 1987, and it requests that the Commission, for purposes of this allocation, approve the use of the more recent cost of service study allocation parameters, based on the allocation by Robert Greneman of the production-related portion of the NIPSCO proposed rate base in Cause No. 41746, as shown in Mr. Greneman's work papers filed in that case in support of, Respondent's Exhibit RDG–2 in Cause No. 41746. Copies of the pertinent workpapers are contained in Petitioner's Exhibit RDG–2 in this case. Mr. Greneman's allocation percentages are based on more recent usage and were used in calculations set forth in Exhibit CEH–8. NIPSCO believes this later study establishes a better allocation of costs on its electric system, because it is more current. NIPSCO's costs by customer class and by rate schedule, and the numbers of customers taking service within rate schedules have substantially changed since 1987, as have the rate schedules, themselves.

Appellee's App. p. 76. She further stated that almost a dozen new rate schedules had been approved since the time of the 1987 study.

During the administrative proceedings, NIPSCO requested the Commission's permission to use the more recent Greneman study rather than the 1987 study. CAC attempts to make an issue of the fact that the 42150 Order "is devoid of any language approving such a waiver" to use the Greneman study. Appellant's Br. p. 18. By virtue of the fact that the Commission used the Greneman study, it necessarily permitted its limited use rather than the 1987 study for purposes of allocating NIPSCO's QPCP costs among customer classes. The Commission inherently granted the waiver, even if it did not do so expressly.

Given the evidence before the Commission on the benefits of using the more recent study, we cannot conclude that doing so was erroneous. NIPSCO presented testimony explaining the Greneman study and establishing a basis for using it rather than the 1987 study, namely that the 1987 study would produce an inaccurate and inequitable result by over-assigning costs to the old rate classes and assigning no costs at all to the classes added since 1987. Enforcing strict compliance with 170 IAC 4–6–15 by requiring the Commission to use the 1987 study would produce the illogical result of having NIPSCO allocate costs based on outdated data when a more recent study is available. Again, we note that we have indicated our preference to place substance over form. *See MDM Investments,* 740 N.E.2d at 933. In doing so here, we cannot conclude that the Commission erred in permitting NIPSCO to rely on Greneman's study. *See Robinson v. Gazvoda,* 783 N.E.2d 1245, 1250 (Ind.Ct. App.2003) (stating that we are required to determine and then apply the legislative intent underlying the statute and to construe the statute in such a way as to prevent absurdity and hardship and to favor public convenience; in so doing, we consider the objects and purposes of the statute, as well as the effects and consequences of such an interpretation), *trans. denied.*

Furthermore, Greneman addressed the fact that the 1987 study is still being used on other costs associated with NIPSCO's

operations and concluded that it was appropriate to do so for those costs and not do so with respect to QPCP costs. He stated:

> My concerns are technical, and I think I've verbalized my technical concern with respect to the Clean Coal Technology trackers. However, with respect to cost per service, they are self—if you will, self-normalizing, and I can explain that.
>
> What we have—if you design rates properly and classes—load factors change between classes or customers migrate between classes, there will be different cost allocations to those classes as a result of customers moving because of load factors changing.
>
> The rates are well designed. The revenues will track the cost. And, indeed, the cost-of-service study I recently performed showed that the revenues produced from the rates of 1987 still yield relatively sound rates of return across all customer classes.
>
> * * * * * *
>
> So those are two technical reasons why one is appropriate for one and the other is appropriate.

Appellee's App. pp. 115–116. We are not persuaded by CAC's logic that using the two studies for different purposes is erroneous in light of Greneman's testimony. The Commission's approval of NIPSCO's reliance on the two studies is supported by sufficient evidence in the record. We find no error.

## Conclusion

The grounds for appeal raised by CAC are not waived on appeal because its statutory right to become a party on appeal protects its ability to raise issues not addressed by the Commission. The Commission's approval of NIPSCO's exclusion of its QPCP return from the FAC earnings

test was supported by the evidence and was not erroneous. The Commission's approval of NIPSCO's use of the most recent cost of service study was also supported by the evidence and not erroneous. We affirm.

Affirmed.

DARDEN, J., and MAY, J., concur.