**INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR,**
Appellant,

v.

**LINCOLN UTILITIES, INC., and Indiana Water Service, Inc.,**
Appellees.

No. 93A02–0409–EX–790.

Court of Appeals of Indiana.

Sept. 13, 2005.

Transfer Denied Jan. 4, 2006.

*Ind. Dep't of Ins.*, 596 N.E.2d at 230.

Susan L. Macey, Indiana Utility Consumer Counselor, Randall C. Helmen, Deputy Consumer Counselor for State Affairs, Daniel M. LeVay, Assistant Consumer Counselor, Indianapolis, for Appellant.

Fred E. Schlegel, Clayton C. Miller, Baker & Daniels, Indianapolis, for Appellees.

## OPINION

BARNES, Judge.

### Case Summary

The Indiana Office of Utility Consumer Counselor ("OUCC") appeals the decision of the Indiana Utility Regulatory Commission ("IURC") approving the sale of Lincoln Utilities, Inc. ("Lincoln") to Indiana Water Service, Inc., ("IWSI") (Lincoln and IWSI are collectively referred to as "Appellees") and adjusting Lincoln's fair value to 90% of the Appellees' agreed purchase price. We reverse and remand.

### Issue

The OUCC raises one issue for our review, which we restate as whether the IURC should have included property contributed in the aid of construction ("CIAC") in its fair value determination of Lincoln.

### Facts

Lincoln is a small company providing water to less than 2,000 customers in Merrillville. It consists mainly of water supply lines contributed by developers and does not include a water treatment facility. IWSI is a subsidiary of Utilities, Inc., which owns 400 utility companies in sixteen states. IWSI is a holding company that was created to facilitate the purchase of Lincoln. On October 24, 2000, IWSI contracted to purchase Lincoln for $1,250,000. Although at that time Lincoln's fair value was $44,951, the contract was contingent on the IURC approving an acquisition adjustment, which would allow IWSI to increase Lincoln's fair value to 90% of the purchase price, or $1,125,000.

The Appellees jointly petitioned the IURC for approval of this acquisition adjustment of Lincoln's fair value. On December 19, 2001, after a hearing, the IURC approved the sale and authorized IWSI to "include in its next rate case an acquisition adjustment on which it would be permitted to earn a return equal to 90% of the Purchase Price, less the depreciated value at the time of closing . . . ." Appellant's App. p. 7. In other words, the IURC approved the request to adjust Lincoln's fair value from $44,951 to $1,125,000. This amount included CIAC in valuation of Lincoln.

After the IURC issued its order, the OUCC sought rehearing, which was denied. On March 5, 2002, the OUCC indicated its intent to appeal. Shortly thereafter, IWSI completed its purchase of Lincoln notwithstanding the OUCC's pending appeal. On March 19, 2003, we reversed and remanded because the IURC's authorization of the acquisition adjustment including CIAC was not based

on substantial evidence. *See Indiana Office of Util. Consumer Counselor v. Lincoln Utils., Inc.,* 784 N.E.2d 1072, 1077 (Ind.Ct.App.2003).

On remand, the IURC held a field hearing in Merrillville on September 30, 2003, and a hearing in Indianapolis on October 30, 2003. The IWSI presented expert testimony that the reproduction cost new less depreciation ("RCNLD") of Lincoln was $1,695,958.

In response, the OUCC presented evidence that certain amounts should be excluded from the RCNLD when determining fair value. The OUCC also presented evidence that Lincoln's fair value when the parties entered the agreement was $41,951 and that Lincoln's fair value should be calculated at $70,147.[1] The OUCC's evidence also consisted of evidence that Lincoln will earn an undeserved profit or windfall if the acquisition adjusted fair value includes CIAC and that the ratepayer "will ultimately finance this undeserved windfall through higher rates . . . ." Appellant's App. p. 10.

The OUCC also presented policy reasons favoring the exclusion of CIAC from the fair value. The OUCC asserted, "allowing CIAC to be recognized during the sale of a utility implies that there are two different fair value rate bases: One for setting rates and one for determining if the purchase price of a utility is reasonable." *Id.* The OUCC also urged that such a system provides improper incentive for utilities with significant CIAC to sell their assets and exploit the value of "contributed plant." Appellant's App. p. 10.

In its August 24, 2004, order, the IURC concluded that the RCNLD should be calculated at $1,513,198. The IURC again

approved an acquisition adjustment and set the fair value at $1,125,000, or 90% of the $1,250,000 purchase price, in accordance with the terms of the Appellees' agreement. The IURC included CIAC in the adjusted fair value.

The IURC also provided the following discussion:

Because Lincoln was unable to sufficiently demonstrate any net benefit to ratepayers as a result of favorable accounting treatment, we determined that Lincoln was not "small" or "troubled" in the context of perhaps qualifying for a return "of" an acquisition adjustment. However, Lincoln is, nonetheless, a small family-owned utility and the owner desires to be rid of his utility obligations. The OUCC suggests that the contributed property, which the present owner has always had to exclude from rate base, should continue to be excluded by any new owner. The consequence of following the OUCC's suggestion, however, is that a utility such as Lincoln, which consists of approximately 98% contributed property, would be of little or no value to a legitimate and qualified prospective purchaser. It follows that since the original owner made no investment in almost the entire original plant, the original owner not be allowed to earn a return on that donated property, which up until now has been our consistent ratemaking approach with this utility. But certainly the donated plant still has value, and it is not reasonable to expect a larger, qualified utility to invest in a facility that has such a small, or even negative rate base upon which to earn little if any return. To not allow the character of what was CIAC to change in this unique situation

---

1. The OUCC reached this conclusion by multiplying the portion of the adjusted RCNLD by the 4.64% that Lincoln actually contributed to

the facility. $70,147 is the RCNLD when CIAC is excluded from the valuation.

would be to invite not only the inability to sell such a utility, but the decline of the utility to a point that it does become "troubled," with all the human health, environmental, and financial concerns that accompany a troubled utility.

Our decision to allow an acquisition adjustment on 90% of the purchase price in this Cause is unique and fact-specific. First Lincoln is a small utility that because it is so heavily weighted with CIAC, has rates that are well below those of a comparable utility with similar, non-contributed infrastructure. Second, because almost all of its plant is excluded from rate base, Lincoln has only nominal operating income. In addition, because of its size and limited value due to the exclusion of CIAC, Lincoln may have difficulty attracting capital. These financial factors could impact Lincoln's ability to perform needed maintenance and repairs, which puts Lincoln in a category of being prone to becoming a troubled utility. Third Lincoln is being acquired by a large, qualified utility that should result in great efficiencies and great access to capital, which should bring about tangible savings to customers over time. As such a utility, IWSI is in a position to ensure that Lincoln does not become troubled. Fourth, Lincoln has been in operation for many years and a vast majority of its plant has been carried on its books as CIAC for those many years. We would be skeptical of the intentions of a young utility operating primarily with donated property, that wanted to quickly convert the character of that property for financial gain.

\* \* \* \* \*

Finally, the Commission's practice of awarding favorable acquisition adjustment treatment is not incompatible with those statutes that govern valuation of public utilities. Although the OUCC contends that CIAC should *never* be included in the fair value rate base of either the initial donee or the subsequent purchaser of the utility, the OUCC seems to have not considered the provisions of I.C. 8–1–30. That chapter gives the Commission the authority, in certain circumstances, to force the sale of a utility due to poor service or other factors. In the case of a forced sale, the person acquiring the utility is required by statute to pay the fair *market* value of the utility. Fair market value by definition includes intangibles like goodwill and would seem to also include the value of infrastructure previously donated to the utility. Thus, the continuum of water utility valuation has two seemingly incompatible endpoints: at one end of the spectrum a utility is valued for using fair value as defined by I.C. 8–1–2–6, which excludes CIAC and intangible assets; at the other end of the spectrum, a forced sale is to be based on the fair market value of a utility, which include those kinds of assets.

However, the type of utility at issue in this Cause, and the level of acquisition adjustment we are allowing for its purchaser, seem to fit appropriately between these two ends of the valuation spectrum. Lincoln is neither a well-developed, financially-sound utility, nor a candidate for a forced sale. And just as Lincoln, as a utility, falls operationally and financially somewhere between the best and worst, our determination on an acquisition adjustment falls somewhere between these two corresponding valuation endpoints. In other words, utilities that are well-managed and that provide adequate service are valued using the fair value system prescribed by statute. Those utilities that are determined by the Commission to possess characteristics like those we have as-

cribed herein to Lincoln may qualify for favorable acquisition adjustment treatment that would allow at least partial recovery of investments above and beyond what is typically deemed to constitute the utility's fair value. Finally, those utilities that are poorly operated or are in poor condition are valued at fair market value when forcibly sold. Therefore, by falling somewhere in between these two statutory endpoints, our determination with respect to the acquisition of Lincoln seems in harmony with spectrum of utility valuation.

Appellant's App. p. 14–15.

The OUCC sought rehearing, which the IURC denied. The OUCC now appeals for a second time.

### Analysis

As an initial matter, we address the fact that since the IURC issued its first order, IWSI purchased Lincoln for $1,250,000. The Appellees urge us to view the OUCC's arguments from the perspective that IWSI is the current owner of the facility and that Lincoln's gain as a result of the IURC's approval is no longer a relevant consideration. When the Appellees completed the sale, however, the approval of the acquisition adjustment had not been resolved with finality.

Moreover, the issue before us today is the same issue that the IURC considered in 2001, the same issue that we addressed in the first appeal, and the same issue that the IURC reconsidered on remand. We are not faced with an issue that arose for the first time on remand. The question remains how Lincoln's fair value should be calculated, not the extent to which IWSI is entitled to earn a return on the price it paid for Lincoln.

This is especially true given that the Appellees' agreement was conditional upon the IURC approving the acquisition ad-

justment of the fair value, yet IWSI decided to complete the purchase while the OUCC's first appeal was pending. Although it is possible that IWSI will suffer a significant loss as a result of today's decision, it was IWSI's decision to complete the purchase before the appellate process had been exhausted.

 As to the merits of the case, the OUCC argues that the IURC improperly included CIAC when it authorized the acquisition adjustment and assessed Lincoln's fair value at 90% of the agreed purchase price. When reviewing IURC orders, we first must determine whether the order is supported by specific findings of fact and by sufficient evidence. *Northern. Ind. Pub. Serv. Co. v. LaPorte*, 791 N.E.2d 271, 278 (Ind.Ct.App.2003). We then consider whether the decision is contrary to law. *Id.* "A decision is contrary to law when the IURC fails to stay within its jurisdiction and to abide by the statutory and legal principles that guide it." *Id.* Further, an agency's authority is limited to that which is granted to it by statute. *Id.*

Indiana Code Section 8–1–2–6 governs the valuation of utilities and provides:

(a) The commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value, giving such consideration as it deems appropriate in each case to all bases of valuation which may be presented or which the commission is authorized to consider by the following provisions of this section. . . .

(b) The lands of such public utility shall not be valued at a greater amount than the assessed value of said lands exclusive of improvements as valued for taxation. In making such valuation no account shall be taken of presumptive value resting on natural resources independent of any structures in relation thereto, the natural resource itself shall

be viewed as the public's property. No account shall be taken of good will for presumptive values growing out of the operation of any utility as a going concern, all such values to rest with the municipality by reason of the special and exclusive grants given such utility enterprises. *No account shall be taken of construction costs unless such costs were actually incurred and paid as part of the cost entering into the construction of the utility.* All public utility valuations shall be based upon tangible property, that is, such property as has value by reason of construction costs, either in materials purchased or in assembling of materials into structures by the labor or (of) workers and the services of superintendents, including engineers, legal and court costs, accounting systems and transportation costs, and also including insurance and interest charges on capital accounts during the construction period. As an element in determining value the commission may also take into account reproduction costs at current prices, less depreciation, based on the items set forth in the last sentence hereof and shall not include good will, going value, or natural resources.

(Emphasis added).

■ Fair value is the rate base upon which a utility can earn a return. *Office of Util. Consumer Counselor v. Gary–Hobart Water Corp.*, 650 N.E.2d 1201, 1203 (Ind. Ct.App.1995). CIAC has been described as "donations provided at no cost to the utility." *Lincoln*, 784 N.E.2d at 1076 n. 2. CIAC may come from state or local governments, customers, or developers as incentives to upgrade utilities to accommodate larger customers without burdening existing customers. *Id.* In this case, CIAC is property that Lincoln did not provide for the development or improve-

ment of the facility from its own pocket. *See id.* In its order, the IURC acknowledged that Lincoln consists of approximately 98% "contributed property" or CIAC. Appellant's App. p. 14. Thus, a significant portion of the facility was contributed by persons or entities other than Lincoln.

■ The OUCC argues that based on the language of Indiana Code Section 8–1–2–6(b), CIAC should be excluded from the determination of Lincoln's fair value. This section provides in part, "No account shall be taken of construction costs unless such costs were actually incurred and paid as part of the cost entering into the construction of the utility." Ind.Code § 8–1–2–6(b).

The exclusion of CIAC from the assessment of Lincoln's fair value is consistent with a 1996 case involving Lincoln. *See Lincoln Utils., Inc. v. Office of Util. Consumer Counselor*, 661 N.E.2d 562 (Ind.Ct. App.1996), *trans. denied.* At that time, the amount of CIAC exceeded Lincoln's property value. *Id.* at 563–64. Thus, Lincoln had a negative rate base. *Id.* at 564. Lincoln petitioned the IURC seeking a 19% increase of its revenues. *Id.* In response, the OUCC recommended a 2.95% increase, which would have allowed Lincoln to "break-even." *Id.* The IURC approved a 3.51% increase. *Id.* In reaching this result, the IURC excluded CIAC from Lincoln's fair value.

Lincoln appealed, making arguments similar to those made by the Appellees today. *Id.* at 564–65. Specifically, Lincoln argued that Indiana Code Section 8–1–2–6 does not differentiate between property purchased by the company and property contributed by someone else. *Id.* at 565. We affirmed the IURC's decision concluding that "when there is no investment, there should be no return." *Id.* (noting that the concept of return on actual invest-

ment echoed through all of the cases cited by the parties).

Likewise, in *South Haven v. Utility Consumer Counselor,* 621 N.E.2d 653, 655 (Ind.Ct.App.1993), a developer contributed 95% of the assets listed on the utility's books. On appeal, we addressed the exclusion of CIAC from the assessment of its fair value. *Id.* Although the utility argued that the owner of the plant was entitled to earn a return on the fair value of the entire plant, we held, "the portions contributed are not investments for which a return is allowed." *Id.*

In *Public Service Commission v. City of Indianapolis,* 235 Ind. 70,78 131 N.E.2d 308, 310 (1956), our supreme court considered a previous version of Indiana Code Section 8–1–2–6 in determining whether the Public Service Commission of Indiana acted within its jurisdiction and conformed to the statute when it determined the utility's rates. Addressing specific findings made by the trial court, the court concluded that the customers' meter deposits and advances for construction were included in the calculation of fair value. *Id.* at 93, 131 N.E.2d at 317. Our supreme court observed, "These are not items included in the total which compose the figure fixed for the fair value of the utility's property. These deposits constitute an obligation which the Company owes to its customers the same as any other indebtedness, bonded or otherwise." *Id.*

Here, the IURC observed in its order, "It follows that since the original owner made no investment in almost the entire original plant, that the original owner not be allowed to earn a return on that donated property, which up until now has been our consistent ratemaking approach with this utility." Appellant's App. p. 14. The IURC also stated, "at one end of the spectrum a utility is valued for using fair value as defined by I.C. 8–1–2–6, which excludes CIAC and intangible assets[.]" *Id.* at 15. Thus, by excluding CIAC when assessing a utility's fair value, even the IURC has recognized a policy against the owner of a utility profiting from the contributions of others.

▪ In response, the Appellees argue that the statute "says nothing about *who* paid the construction costs ...." Appellees' Br. p. 12. Indiana Code Section 8–1–2–6(b) provides in part, "No account shall be taken of construction costs unless such construction costs were actually incurred and paid as part of the cost entering into construction of the utility." The Appellees basically assert that we should overlook this exclusion and do not supply us with an alternative interpretation of this exclusion. We are not permitted to adopt an interpretation that renders this exclusion meaningless and decline the Appellees' invitation to do so.[2] *See Kaser v. Barker,* 811 N.E.2d

---

2. The Appellees also argue that the original cost of a utility is not a proper basis for determining its fair value. The OUCC responds, "Excluding CIAC from the rate base is not the equivalent of imposing an original cost rate base." Appellant's Reply Br. p. 12. In fact, the OUCC posits that fair value should reflect inflation in the utility's initial investment. Thus, neither party is suggesting that fair value equals the original cost that Lincoln supplied for construction of the facility. However, the original cost of the utility is one factor that the IURC may consider. *See Pub. Serv. Comm'n,* 235 Ind. at 96, 131 N.E.2d at

318. In addressing the assessment of fair value, our supreme court observed:

The rate-making process involves a balancing of all of these factors and probably others; a balancing of the owner's or investor's interest with the consumer's interest. On the one side, the rates may not be so low as to confiscate the investor's interest or property; on the other side the rates may not be so high as to injure the consumer by charging an exorbitant price for service and at the same time giving the utility owner an unreasonable or excessive profit.

930, 932 (Ind.Ct.App.2004) (observing that we must not interpret one provision of a statute so as to render other provisions of the same meaningless), *trans. denied.*

■ The Appellees also contend that the statute requires all tangible property to be considered in determining fair value. With regard to tangible property, the statute provides, "All public utility valuations shall be based upon tangible property ...." I.C. § 8–1–2–6(b). Contrary to the Appellees' assertion, this language does not require that *all* tangible property be included in the valuation. Instead, it simply requires that *only* tangible property be included in the valuation.

Further, we do not dispute that the statute requires the IURC to consider all property. However, the statute also lists specific property to be excluded from the valuation process, including natural resources and goodwill. Thus, the plain meaning of the statute requires the IURC to consider all of a utility's property except that which it specifically excludes. Although it could have been more artfully worded, the statute excludes CIAC from the calculation of fair value. This approach is consistent with the IURC's past treatment of Lincoln and our cases prohibiting utilities from earning returns on the contributions of others.

The parties set forth policy reasons in support of their arguments. In the first appeal, we acknowledged several policy reasons for including CIAC when determining Lincoln's fair value. We observed:

> We do not dispute that approving this transaction may make good economic sense. If CIAC were never includable in the fair market value upon the trans-

fer of a utility, it would render utilities with a high percentage of CIAC virtually valueless, and there would be no incentive for larger, more efficient companies to acquire those like Lincoln, the small size and inefficiency of which render it untenable in the long term.

*Lincoln,* 784 N.E.2d at 1077. Even in light of these policy considerations, we concluded, "Nonetheless, the sale cannot be approved if it is contrary to statute." *Id.* Thus, despite all of the policy reasons to include CIAC in the fair value, the statute must permit the inclusion of such before the IURC is authorized to do so.

■ We recognize that the IURC has the technical expertise to administer regulatory schemes devised by the legislature. *U.S. Gypsum, Inc. v. Indiana Gas Co., Inc.,* 735 N.E.2d 790, 795 (Ind.2000). We also give great deference to the IURC's rate-making methodology. *Office of Util. Consumer Counselor v. Citizens Tel. Corp.,* 681 N.E.2d 252, 255 (Ind.Ct. App.1997). However, in justifying the inclusion of CIAC when determining Lincoln's fair value, the IURC improperly exceeded its statutory authority.

Although the IURC provided a detailed explanation of its rationale for approving the acquisition adjustment, its explanation did not give it the authority to include CIAC in Lincoln's fair value. In its decision, the IURC concluded that Lincoln fell somewhere between a "troubled"[3] utility and well-developed, financially sound utility. The IURC then explained that Lincoln's intermediate position warranted treatment "in harmony with the statutory spectrum of utility valuation." Appellant's App. p. 15. The regulatory scheme as it currently exists includes statutes for valu-

---

*Id.*

**3.** The IURC may force the sale or appointment of a receiver if a utility has severe deficiencies that it has failed to remedy. I.C.

§ 8–1–30–4. Under such circumstances, the utility is sold at the fair *market* value, not the fair value. I.C. § 8–1–30–5(d).

ing troubled utilities at *fair market value* and a statute for valuing all other utilities at *fair value*. *See* I.C. §§ 8–1–30–4, 8–1–2–6. There is no "spectrum of utility valuation" as the IURC posits and no provision allowing for non-troubled utilities to be valued at anything other than fair value pursuant to Indiana Code Section 8–1–2–6. A utility is either troubled or it is not for valuation purposes. As the IURC recognized, Lincoln is not a troubled utility. Thus, Lincoln's fair value should have been calculated in accordance with the plain language of Indiana Code Section 8–1–2–6, which excludes CIAC. The IURC erred in approving the acquisition adjustment in the amount of 90% of the Appellees' agreed purchase price and including CIAC in its calculation of Lincoln's fair value.

Rate-making is a legislative function. *Pub. Serv. Comm'n*, 235 Ind. at 81, 131 N.E.2d at 312. It is for the legislature to decide how the IURC should value utilities like Lincoln, which have high levels of CIAC and low fair values making it difficult for them to attract purchasers. Absent the legislative authority to do so, the IURC improperly included CIAC in Lincoln's fair value.

### Conclusion

Indiana Code Section 8–1–2–6 excludes CIAC from the calculation of a utility's fair value. This is consistent with our decisions prohibiting a utility from earning a profit on the contributions of others. Thus, the IURC improperly included CIAC when it assessed Lincoln's fair value at 90% of the Appellees' agreed purchase price. We reverse and remand.

Reversed and remanded.

CRONE, J., and NAJAM, J., concur.